## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 19-2340 |
| | * | |
| E.R.R. LLC, ET AL. | * | SECTION "L" (5) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.       BACKGROUND

This case arises out of an oil spill in the Mississippi River in May 2015. R. Doc. 1 at ¶ 1. Plaintiff, the United States of America, filed suit against E.R.R. LLC, Evergreen Resource Recovery LLC, and Hugh Nungesser, Jr. (collectively, "Defendants"), seeking recovery of cleanup and removal costs totaling $632,262.49 under the Oil Pollution Act ("OPA"). Plaintiff contends that the oil spill originated from a wastewater storage and treatment facility in Belle Chasse, Louisiana, owned and operated by Defendants. *Id.* at ¶ 29. Plaintiff maintains that Defendants are responsible parties under the OPA and liable for the cleanup and removal costs.

Defendants deny all liability and object to Plaintiff's designation of Defendants as responsible parties under the OPA. R. Doc. 8 at 12. Defendants maintain that "[t]he oil discharge and cleanup costs that are the subject of the Plaintiff's Complaint were caused solely by negligence, acts, fault, or omissions of one or more third parties for whom the Defendants are not legally responsible." *Id.* at 10. This matter came before the Court as a virtual bench trial on October 5-8, 2020. The Court has carefully considered the testimony of all witnesses, exhibits entered into evidence during the trial, and the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.

To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II.        FINDINGS OF FACT

### a.        *The Facility*

1.    In 2011, Hugh Nungesser, Jr. and Andy Frisard formed Evergreen Resource Recovery, LLC ("Evergreen"), to operate a biological wastewater treatment facility (the "Facility") on 9875 Highway 23 South in Belle Chasse, Louisiana. R. Doc. 131 at ₽ 1.

2.    The Facility is located on the west bank of the Mississippi River near mile marker 74. R. Doc. 121, Uncontested Facts at ₽ 1.

3.    Mr. Nungesser and Mr. Frisard created E.R.R. LLC ("E.R.R.") in 2014. Evergreen and E.R.R. owned and operated the Facility at all material times. *Id.* at ₽ 2; R. Doc. 129 at ₽ 5.

4.    Defendant Evergreen was the registered operator for the wastewater discharge permit issued by the Louisiana Pollutant Discharge Elimination System ("LPDES") permit program in 2012. R. Doc. 129 at ₽ 7.

5.    The Facility receives oily water from various sources and then treats and cleans the water through a biological and mechanical treatment process. R. Doc. 131 at ₽ 5.

6.    Mr. Nungesser helped design and build the oily wastewater treatment system and worked to maintain the system. R. Doc. 129 at ₽ 15.

7.    The Facility typically receives wastewater by trucks on land but has at least once conducted an oily water transfer from a barge on the Mississippi River. Trial Testimony of Gary Amendola.

8.  Oily water begins the treatment process in a 66,000-gallon receiving tank, which is adjacent to another 66,000-gallon processing tank where the fluids travel next. R. Doc. 131 at ¶¶ 6-7.

9.  From the processing tank, the fluids travel through a series of filters and digesters that further clean the water. Ultimately, the treated water accumulates in an 44,000-gallon outfall tank where it is tested. *Id.* at ¶¶ 7-8.

10. To test the treated water, samples are sent to an LPDES-approved lab for testing. The treated water must remain in the outfall tank until the lab results return. R. Doc. 131 at ¶ 9.

11. If the treated water meets the parameters required by the LPDES permit, it is then discharged from the outfall tank through the discharge pipe and into the Mississippi River. R. Doc. 131 at ¶ 9; R. Doc. 121, Uncontested Facts at ¶ 31.

12. This discharge pipe runs underground and underwater into the river in a straight line from the three circular tanks in the Facility's treatment area. R. Doc. 129 at ¶ 46.

13. Defendants have sole control of the discharge pipe, as well as the existing hoses which can be reconfigured to connect the receiving tank directly to the discharge pipe. Trial Testimony of Gary Amendola.

14. During the March 16, 2015 to June 18, 2015 time period, Defendants received numerous truck transfers and one barge transfer of oily water. R. Doc. 129 at ¶ 19; Plaintiff's Ex. 76C.

15. The Facility also houses eight 20,000-gallon frac tanks, which are often used to store oily water received from trucks. R. Doc. 131 at ¶ 29; Plaintiff's Exhibit 76 at Table 2.

16.   The Facility, in accordance with applicable laws, adopted a "Spill, Prevention, Control, and Countermeasure Plan" ("SPCC Plan") on December 5, 2014. This plan details procedures and plans in the event an oil spill occurs at the Facility. Plaintiff's Exhibit 19.

17.   Mr. Nungesser was designated the primary oil spill coordinator for the Facility pursuant to the SPCC Plan. R. Doc. 129 at ¶ 15; Plaintiff's Exhibit 19.

18.   The SPCC Plan requires that the Facility keep one empty "standby" frac tank at all times. Plaintiff's Exhibit 19 at 11.

### b.   The Envision Barge Transfer at Issue in This Case

19.   In May 2015, Mr. Nungesser arranged for an oily water transfer operation to the Facility from a barge known as the DBL 118. R. Docs. 121, Uncontested Facts at ¶ 2; 131 at ¶ 11

20.   DBL 118 is a double-hull, double-sided tanker barge owned and operated by Envision Marine ("Envision"). R. Doc. 131 at ¶ 11.

21.   At all material times, Envision used DBL 118 to receive oily slops from vessels on the Mississippi River. DBL 118 contains three tanks for receiving these slops. *Id.* at ¶ 12-13.

22.   Mr. Nungesser and Michael DeVigneaud, President of Envision, arranged for DBL 118's transfer to the Facility on May 12, 2015. R. Doc. 129 at ¶15.

23.   The morning of May 12, 2015, the Envision barge DBL118 arrived at the Facility to begin offloading oily water. DBL 118 was pushed by the tugboat M/V Omaha. R. Doc. 121, Uncontested Facts at ¶ 2.

24.   Richard Norton, Jr. was the DBL 118 tankerman at the time of this transfer, which began around 8:00 AM. R. Doc. 121, Uncontested Facts at ¶ 4; Defendants' Exhibit 20, at -930.

25.   Josh Karnehm, an E.R.R. employee, was in charge of the transfer and was present when the DBL 118 began transfer until its departure later that night. Trial Testimony of Joshua Karnehm.

26.   Throughout the day, fluids were transferred from the barge to the receiving tank at the Facility. R. Doc. 121, Uncontested Facts at ℙ 3.

27.   The transfer was completed around midnight, with Defendants' non-hazardous manifest record stating that 202,877 gallons of oily wastewater had been transferred. Defendants' Exhibit 20, at -930.

28.   Around 11:45 PM, Richard Norton, Jr., noticed what he described as a discoloration in the water off the port stern of the barge, closest to the riverbank. The parties dispute whether the tugboat crew also noticed any discoloration. R. Doc. 121, Uncontested Facts at ℙ 4; R. Doc. 129 at ℙ 28.

29.   In any event, the tug's crew and captain inspected the tug and barge and did not see any damage to either which could indicate that any oil had come from the vessels. R. Doc. 129 at ℙ 29.

30.   Joshua Karnehm testified that he smelled oil but did not see any discoloration in the water or oil leaking from the barge. Trial Testimony of Joshua Karnehm.

31.   No E.R.R. employees reported an oil discharge to the National Response Center that night. R. Doc. 129 at ℙ 6.

32.   The tugboat and barge left the wastewater treatment facility at about 12:20 AM on May 13, 2015 and traveled upriver approximately three miles to Turn Service's Meraux fleet at mile marker 86.5. R. Doc. 121, Uncontested Facts at ℙ 7.

33.  At the time of departure from the Facility, Mr. Norton gauged the barge and recorded a total volume of 214,544 gallons of oily water. R. Doc. 131 at ⁋ 94

34.  The tugboat and the DBL 118 arrived at the Meraux fleet at about 2:20 AM on May 13, 2015. R. Doc. 121, Uncontested Facts at ⁋ 8.

35.  The barge was then pushed upriver by another tugboat to Ama, Louisiana on May 13, 2015, arriving at Ama anchorage at mile marker 115 around 9:15 PM. *Id.* at ⁋ 9.

36.  At all material times, Intertek Group, plc ("Intertek"), an assurance, inspection, product testing and certification company, had been hired to inspect the DBL 118 before and after each slop transfer and no leakage was observed. R. Doc. 131 at ⁋14.

37.  On May 13, 2015, Intertek inspected the DBL 118 after it arrived in Ama, Louisiana. Intertek gauged the DBL 118 and recorded a total volume of 178,253 gallons. *Id.* at ⁋ 96.

38.  The discrepancy between Intertek's reading and Richard Norton's DBL 118 gauge reading the morning of May 13, 2015 is around 36,000 gallons. Norton and Intertek used different measurement methods.

### c.  *Post-spill Investigations*

39.  In the early hours of May 13, 2015, personnel from Port Ship Service, Inc. and Chevron Corporation notified the National Response Center that there was oil in the river at their respective locations downriver from the Facility. R. Doc. 121, Uncontested Facts at ⁋ 6.

40.  Personnel from the Louisiana Department of Environmental Quality ("LDEQ") arrived at the Facility at approximately 7:00 AM on May 13, 2015 to meet with E.R.R. employees and inspect the premises. R. Doc. 131 at ⁋ 55; Trial Testimony of Chris Lozier.

41.  Oil Mop, LLC ("Oil Mop") is a professional oil spill removal organization that was retained to clean up the spilled oil at issue. R. Doc. 129 at ⁋ 53.

6

42.    Oil Mop and Defendants had entered into a Master Services Agreement to clean up oil spilled from the Facility and was one of E.R.R.'s designated spill contractors. *Id.* at ¶ 54, 56; Plaintiff's Exhibit 52.

43.    Oil Mop arrived around the same time as the LDEQ and installed a protective boom from Defendant's transient dock to the shoreline of the west bank in an effort to contain the spilled oil. Trial Testimony of Hugh Nungesser; Plaintiff's Exhibit 1.

44.    Mr. Lozier and an LDEQ representative walked the premises together and looked along the bank. Chris Lozier, an E.R.R. employee, remembers seeing an oil sheen in the river by Oil Mop's newly placed boom. R. Doc. 131 at ¶ 56-57; Trial Testimony of Chris Lozier.

45.    Coast Guard pollution investigators arrived at the wastewater treatment facility between 8:00 AM and 9:00 AM on May 13, 2015 to investigate the oil spill. *Id.* at ¶ 12; R. Doc. 131 at ¶ 60.

46.    Daniel Kampsnider, formerly a Second-Class Petty Officer in the Coast Guard and a qualified pollution responder, obtained a sample of oil collected from the hose used during the May 12, 2015 Envision barge transfer. R. Doc. 121, Uncontested Facts at ¶ 13.

47.    During the Coast Guard's visit, Hugh Nungesser, Jr. opened the spigot on the outfall tank for the investigators. *Id.* ¶ 23.

48.    Officer Kampsnider and the other investigators then drove around a mile downriver from the Facility and obtained another sample of oil from the shoreline on the west bank in the vicinity of the Facility, as well as downriver. *Id.*; Trial Testimony of Daniel Kampsnider.

49.    The investigators observed oil in the river and along the adjoining shoreline beginning at the Facility and continuing approximately one mile downriver. R. Doc. 129 at ¶ 35.

50.   Officer Kampsnider and the other investigators took pictures of oil discharge on the west bank. R. Doc. 129 at ¶ 50.

51.   Water gauge data and the photographs indicate a decreasing water level in the river from the night of May 12, 2015 to the morning of May 13, 2015, leaving oil deposits on shore. *Id.*

52.   The samples of the spill from the shore and hose were sent to the Coast Guard Marine Safety Laboratory. R. Doc. 121, Uncontested Facts at ¶ 14.

53.   The Coast Guard did not obtain samples from the Envision DBL 118 barge or visually inspect the barge. *Id.* at ¶¶ 18-19.

54.   That same day, Coast Guard Officer James Langford contacted Michel DuVigneaud, the President of Envision, as part of the Coast Guard's investigation. Mr. DuVigneaud took photos of the DBL 118 on May 13, 2015 and sent them to Officer Langford. Plaintiff's Exhibit 26; Trial Testimony of James Langford.

55.   The photos did not show any damage or leaks on the DBL 118. Further, there were no relevant barge or tug repair records from that day or the days immediately following. Trial Testimony of James Langford.

56.   At 9:40 AM CST on May 13, 2015, Coast Guard Sector NOLA IMD requested an overflight of the incident location. Doc. 121, Uncontested Facts at ¶ 10.

57.   Coast Guard's overflight observer, Liam McDonnell, observed a trail of oil from the Facility to downriver. R. Doc. 129 at ¶ 37.

58.   At approximately 10:15 AM, Lieutenant McDonnell observed a dark patch on the river adjacent to the Facility. *Id.* at ¶ 38.

59.   Liam McDonnell took an aerial photograph of that area on his iPhone, on May 13, 2015 at 10:16 AM CST. R. Doc. 121, Uncontested Facts at ⁋ 11.

60.   The photograph shows a plume of dark matter in the river adjacent to the Facility, in the area of the river terminal of the discharge pipe. The plume is surrounded by a sheen that extends to Oil Mop's boom at Defendant's dock and downriver as well. Plaintiff's Exhibit 1; Trial Testimony of Dr. Garcia.

61.   Lieutenant McDonnell did not observe oil upriver of the Facility; however, he did not take aerial photos upriver or actually travel upriver of the Facility. *Id.* at ⁋ 39.

62.   At the time of the incident, Lieutenant McDonnell did not have his Coast Guard pollution responder qualification but was toward the end of his training. Trial Testimony of Liam McDonnell.

63.   Dr. Oscar Garcia, one of Plaintiff's witnesses, is an expert in photogrammetric analysis, particularly in the oil spill context. Trial Testimony of Dr. Garcia.

64.   Dr. Garcia's photogrammetric analysis confirms that the dark plume in Lieutenant McDonnell's photograph was oil that was recently discharged from an underwater source. Dr. Garcia also confirmed that the oil could not have traveled far from the point of discharge at the time of the photograph. R. Doc. 129 at ⁋ 47.

65.   On May 14, 2015, Chris Lozier sampled the outfall tank at the Facility for testing. R. Doc. 121, Uncontested Facts at ⁋21.

66.   On May 20, 2015, an inspector with Intertek obtained ten samples from Tank No. 2 receiving tank at the Facility. *Id.* at ⁋ 15.

67. On May 29, 2015, Officer Kampsnider returned to the Facility and took one sample from Tank No. 2. He sent this sample to the Coast Guard Marine Safety Laboratory *Id.* at ₱₱ 16-17.

68. Coast Guard pollution investigators collected a total of three oil samples during their investigation: one from the shoreline downriver of the wastewater treatment facility, one from the facility's transfer hose, and one from Tank No. 2. *Id.* at ₱ 30.

69. Kristy Echols, Head Chemist at the Coast Guard Marine Safety Laboratory and one of Plaintiff's experts, performed two types of tests on the samples: Gas Chromatography (GC) and Gas Chromatography/Mass Spectrometry (GC/MS). R. Doc. 131 at ₱ 110.

70. Ms. Echols' forensic analysis confirmed that the oil collected from the river is a "match" to the oil mixture in the Facility's oily wastewater Tank No. 2. R. Doc. 129 at ₱ 43.

71. Ms. Echols' analysis also showed that the oil collected from the shoreline is not an exact match with the oil sampled from the facility's transfer hose. It was "related" but discernably different. *Id.* at ₱ 44. Therefore, she concluded that the source of this spill was Tank No. 2 on the Facility.

72. Defendants' witness Dr. Gregory Douglas is an expert in environmental forensics and oil fingerprint analysis. Dr. Douglas performed a quantitative chemical analysis using the three Coast Guard samples tested by Ms. Echols. Trial Testimony of Dr. Douglas.

73. Dr. Douglas testified that in his opinion, the spilled oil from the riverbank matched the samples taken from both Tank No. 2 and the transfer hose. Dr. Douglas concluded that the spilled oil could have only come from two sources: the DBL 118 or Tank No. 2. Trial Testimony of Dr. Douglas.  In his opinion the source of the spill was the DBL 118.

74.  Dr. Jacqueline Michel, Plaintiff's expert and a geochemist specializing in terrestrial and marine pollution studies, among other fields, concluded that the Facility was the source of the discharge. Dr. Michel relied on Lieutenant McDonnell's photograph, Ms. Echols' testing results, and her own expertise in oil spill source identification. Trial Testimony of Dr. Michel.

75.  On July 23, 2015, Officer Kampsnider returned to the facility with Joshua Waldmeier, a Coast Guard reservist. Officer Waldmeier had been sent to the site to determine if it was possible for oil to travel from the receiving tank (Tank No. 2), through the treatment process, and out the discharge line. After an inspection, he concluded oil could be allowed to travel from Tank No. 2 to the discharge line. R. Doc. 131 at ¶¶ 127-28.

76.  Gary Amendola, Plaintiff's expert witness and an engineer specializing in wastewater treatment, NPDES permitting, spill prevention, and water quality, analyzed the Facility. Trial Testimony of Gary Amendola.

77.  Mr. Amendola concluded that the end of Defendants' discharge pipe is located underwater directly beneath the location of the dark plume that was observed and photographed by Lieutenant McDonnell. *Id.*

78.  Mr. Amendola also found that the contents of Tank No. 2 were able to bypass the entire treatment process and exit through Defendants' discharge pipe. R. Doc. 131 at ¶ 154-57. This was also consistent with Officer Waldmeier's findings. R. Doc. 131 at ¶ 129.

> ### d.    *Cleanup Operations*

79.  Oil Mop performed oil removal and soil remediation efforts at the request of Defendants from approximately May 13, 2015 to June 26, 2015. Plaintiff's Exhibits 44; 37.

80. Mr. Frisard and Mr. Nungesser communicated with Oil Mop to coordinate the cleanup efforts and billing for the removal work. R. Doc. 129 at ¶ 58.

81. Mr. Nungesser signed off on Oil Mop's daily work reports and did not present any objections to the time spent, the types of cleanup activities, or Oil Mop's invoices. Plaintiff's Exhibit 44; Trial Testimony of Donna Hellberg.

82. Defendants refused to pay Oil Mop for its work, contending that they were not the responsible parties. Plaintiff's Exhibit 44.

83. Oil Mop submitted a claim for reimbursement to the National Pollution Funds Center ("NPFC") in November 2015. R. Doc. 121, Uncontested Facts at ¶ 32; Plaintiff's Exhibit 35.

84. The NPFC adjudicated Oil Mop's claim and determined that removal costs in the amount of $631,228.74 were reasonable and reimbursable removal costs pursuant to the OPA, and, in March 2016, the NPFC reimbursed Oil Mop that amount. R. Doc. 129 at ¶ 65.

85. Through the adjudication process, Oil Mop's original claim amount was reduced from $651,767.26 to the final claim amount of $631,228.74. *Id.* at ¶ 64.

86. As part of the claim adjudication, Oil Mop expressly assigned "all rights, claims, interests, and rights of action under any other law" to the NPFC when it accepted the NPFC's final agency determination on the removal costs. *Id.* at ¶ 66.

87. The United States reimbursed Oil Mop $631,228.74 in March 2016. *Id.* at ¶ 33.

88. In paying Oil Mop's claim, the United States assumed removal costs in the amount of $631,228.74. R. Doc. 121, Uncontested Facts at ¶ 34.

89. The United States incurred OPA administrative adjudication costs to resolve the claim in the amount of $1,033.75. *Id.* at ¶ 35.

90.   Beginning on October 20, 2017, the NPFC billed Defendants for reimbursement in the amount of $632,262.49. R. Doc. 129 at ₱ 69.

91.   To date, Defendants have not reimbursed the United States for these removal and administrative costs.

### III.   CONCLUSIONS OF LAW

#### a.   *Jurisdiction and Venue*

92.   This Court has subject matter jurisdiction over this action and over the parties pursuant to Section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1331 and 1345.

93.   Authority to bring this action is vested in the United States Department of Justice by 28 U.S.C. §§ 516 and 519.

94.   Venue is proper in this District pursuant to Section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. § 1391(b), because it is the judicial district in which Defendants are located and in which the discharge and the resulting response actions occurred.

#### b.   *OPA Designations*

95.   The OPA was enacted in 1990 in an effort to streamline the federal legal process in the aftermath of oil spills so as to "provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills with the petroleum industry." *Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir. 2001) (citing S. Rep. No. 101-94, *as reprinted in* 1990 U.S.C.C.A.N. 772, 723).

96.   Under the OPA, the "responsible party" of "a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and

damages . . . that result from such incident." 33 U.S.C. § 2702. The word "from" is not otherwise defined in the OPA and maintains its ordinary meaning.

97.    Under the OPA, the "responsible party" includes, "[i]n the case of an onshore facility (other than a pipeline), any person owning or operating the facility." 33 U.S.C. § 2701(32)(E).

98.    "Person" is defined to mean an "individual, corporation, partnership, [or] association[.]" 33 U.S.C. § 2701(27).

99.    An "owner or operator" is defined to mean, "in the case of an onshore or offshore facility, any person owning or operating such facility." 33 U.S.C. § 2701(26)(A)(ii).

100.   A "facility" is defined in the OPA to mean "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: . . . storing, handling, transferring, processing, or transporting oil." 33 U.S.C. § 2701(9).

101.   Defendants' oily wastewater treatment Facility, including Tank No. 2 and other storage tanks, hoses, pumps, and discharge pipe associated with the incident, is a "facility" within the meaning of the OPA, 33 U.S.C. § 2701(9). R. Doc. 121, Uncontested Facts at ¶ 28.; *see, e.g.*, *United States v. Jones*, 267 F. Supp. 2d 1349, 1351, 1354 (M.D. Ga. 2003) (holding the defendants' oil processing facility was an OPA facility that consisted of "several different types of tanks and holding facilities"); *United States v. Viking Res., Inc.*, 607 F. Supp. 2d 808, 817 (S.D. Tex. 2009) (recognizing the OPA definition of facility "clearly allows a facility to consist of multiple structures and pieces of equipment").

102.   The OPA defines "navigable waters" as "the waters of the United States, including the territorial sea[.]" 33 U.S.C. § 2701(21). The term "adjoining shoreline" is not defined but is self-explanatory here.

103.   The Mississippi River is a "water of the United States" and a navigable water within the meaning of the OPA and as traditionally understood. See R. Doc. 121 at 19, Uncontested Facts at ¶ 29; 33 U.S.C. § 2701(13); *see Southern Stevedoring Co. v. Henderson*, 175 F.2d 863, 865 (5th Cir. 1949) (recognizing the Mississippi River at New Orleans as "navigable waters").

104.   The OPA defines "oil" to mean "oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil[.]" 33 U.S.C. § 2701(23).

105.   A "discharge" is defined to mean "any emission (other than natural seepage), intentional or unintentional" and includes "spilling, leaking, pumping, pouring, emitting, emptying, or dumping[.]" 33 U.S.C. § 2701(7).

106.   Here, the substance discharged into the Mississippi River on May 13, 2015, was "oil" within the meaning of the OPA, and "discharged" within the meaning of the OPA, 33 U.S.C. § 2701(23).

   *a.*   *Liability Under the OPA*

107.    "The OPA imposes strict liability on parties responsible for the discharge of oil" without regard to fault. *Id.* at 266.

108.   "To demonstrate that a party is strictly liable, the government must prove that (1) the defendant is a 'responsible party' (2) for the 'facility' or 'vessel' (3) from which oil was discharged, or from which there was a substantial threat of discharge, (4) 'into or upon the navigable waters or adjoining shorelines' and (5) that the discharge resulted in 'removal costs and damages.'" *United States v. Viking Res., Inc.*, 607 F. Supp. 2d 808, 815 (S.D. Tex. 2009) (quoting 33 U.S.C. § 2702(a)).

109.   Under the OPA, the United States does not have to prove the non-existence of alternative oil spills or an exact path of discharge.

110.   At all material times, defendants E.R.R. LLC, Evergreen Resource Recovery LLC, and Hugh Nungesser, Jr. owned and operated the Facility within the meaning of the OPA.

111.   During the March 16, 2015 to May 23, 2015 time period, Defendants received at least 340,000 more gallons of oily wastewater than they had the capacity to store and treat. Plaintiff's Exhibit 76F.

112.   During this time period, Defendants made multiple unpermitted wastewater discharges into the river using the facility's discharge pipe. 129 at ¶ 20.

113.   Plaintiff's expert Kristy Echols and Defendant's expert Dr. Gregory Nichols applied rigorous and reliable scientific methods to compare the spilled oil sample to a sample from Defendants' receiving tank, Tank No. 2.

114.   Both experts confirmed that the oil spilled chemically and visually matches the oil found in Tank No. 2. Ms. Echols ruled out any other source of the spilled oil besides Tank No. 2. Dr. Douglas concluded that the spilled oil originated in either Tank No. 2 or the DBL 118 barge itself.  Dr. Douglas concluded that the barge was the source of the spill.

115.   Defendants suggest that the oil spill's source is the DBL 118. This is a double bottom barge with three separate tanks. For this barge to be the source of the oil spill, each of these tanks would have to have a rupture allowing the oil to mix and then be discharged from a failure (hole) in the outer double bottom of the barge. The evidence does not support such an occurrence.

116.   Furthermore, if DBL 118 were the source of the oil spill, there would have been some discharge as the barge traveled upstream. There is no evidence of oil upstream from the Facility.

117.   Defendants also point out that there is a discrepancy of around 36,000 gallons between the Richard Norton's gauge measurement on the DBL 118 at around 12:00 AM on May 13, 2015, and the measurement taken by Intertek later that day.

118.   The evidence is clear that the measurements were made by two different entities using different measurement methods. Further, the DBL 118 inspection performed by Envision and professional third-party Intertek did not show any evidence of damage or leaks. Therefore, the Court is unconvinced that this measurement discrepancy is a material issue in this case.

119.   Defendants also suggest that sunken barges adjacent Defendants' Facility could be the cause of the oil spill at issue. Defendants provided evidence that two barges sunk during Hurricane Katrina and released oil in proximity of the Facility in 2005.

120.   The Court concludes that although it is likely that remains of these barges are located on the riverbed, these barges or their contents could not be the source of the oil spill in question. The discharged oil at issue had a distinctive chemical makeup which correlates only to Tank No. 2, as described above.  Moreover, Plaintiff's expert Kristy Echols, as well as Defendants' expert Dr. Gregory Douglas, both concluded that the oil did not come from any sunken barges.

121.   The Court finds that the credible evidence supports the conclusion that the source of the oil spill was Tank No. 2 at Defendants' Facility, and Defendants are hereby designated at responsible parties under the OPA. Thus, they are liable for reasonable removal costs.

### b. *Reimbursement of Costs Incurred*

122. After the NPFC has paid a claim, § 1012(f) of the OPA states the U.S. government "acquir[es] by subrogation all rights of the claimant . . . to recover from the responsible party." 33 U.S.C. § 2712(f).

123. Therefore, upon paying Oil Mop, the United States acquired Oil Mop's rights against the responsible parties via statutory subrogation.

124. Additionally, "[a]ny person, including the Fund, who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, 17 and causes of action that the claimant has under any other law." 33 U.S.C. § 2715(a).

125. Pursuant to the OPA, statutory interest accrues from the 30th day after the date of billing. 33 U.S.C. § 2705(b)(1).

126. The removal costs and activities in this matter were reasonable and consistent with the National Contingency Plan, as documented in the NPFC's final claim determination and as explained by the NPFC's claims manager Donna Hellberg at trial.

## IV. CONCLUSION

For The Foregoing Reasons:

1. Defendants are liable to the United States for $631,228.74 of removal costs paid from the Fund.

2. Defendants are further liable to the United States for $1,033.75 in administrative costs incurred by the NPFC to adjudicate Oil Mop's claim.

3. Defendants are further liable to the United States for interest, including prejudgment interest to be calculated upon entry of a payment date, based on the PFC's bill to Defendants dated October 20, 2017.

4.  Defendants are further liable to the United States for all litigation costs and attorney's fees in an amount to be determined after trial.


New Orleans, Louisiana, this 17th day of December 2020.


United States District Judge