UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 19-2340 |
| | * | |
| E.R.R. LLC, ET AL. | * | SECTION "L" (5) |
| | * | |

**ORDER AND REASONS**

The Court has before it Defendants' Motion to Limit the Testimony of Gary Amendola, R. Doc. 227. The United States opposes this motion. R. Doc. 228. Having considered the parties' briefing, exhibits, and the applicable law, the Court rules as follows.

**I.     BACKGROUND**

This case arises from an alleged oil spill on the Mississippi River on May 12, 2015. R. Doc. 1 at ¶ 1. Plaintiff, the United States of America, filed suit against E.R.R. LLC ("ERR"), Evergreen Resource Recovery LLC, and Hugh Nungesser, Jr. (collectively, "Defendants"), seeking recovery of cleanup and removal costs totaling $632,262.49 under the Oil Pollution Act ("OPA"). Plaintiff contends that the oil spill originated from a wastewater storage and treatment facility in Belle Chasse, Louisiana, owned by Defendants. *Id.* at ¶ 29. Plaintiff alleges that Defendants did not report oil discharge in the Mississippi River as required under the Clean Water Act. *Id.* at ¶ 27. Further, Plaintiff avers that once the Coast Guard was made aware of the oil "hours later," the Coast Guard found approximately one mile of oil contamination in the river and along the shoreline. *Id.* at ¶ 28. Plaintiff contends that the "Coast Guard investigated potential sources of the oil spill and determined that the spill originated at Defendants' Facility." R. Doc. 1 at ¶ 29.

Plaintiff asserts that Defendants then engaged Oil Mop, LLC ("Oil Mop")—a Coast Guard-certified oil spill removal organization—to conduct removal operations pursuant to a prior

contractual agreement, with cleanup operations beginning on May 13, 2015. *Id.* at ¶ 30. Following completion of the cleanup operations, Plaintiff alleges that "Oil Mop submitted its bill to Defendants on July 22, 2015 . . . [and] Defendants did not pay the bill." *Id.* at ¶ 33. Plaintiff avers that, as a result of Defendants' refusal to make payment, Oil Mop's claim was presented to and adjudicated by the National Pollution Funds Center ("NPFC" or "the Fund"). *Id.* at ¶¶ 34–35. The NPFC subsequently accepted the claim and paid Oil Mop $631,228.74. *Id.* at ¶ 35. Moreover, pursuant to the terms of the alleged agreement, "Oil Mop assigned, transferred, and subrogated all, [sic] rights, claims, interests and rights of action to the United States." *Id.*

Plaintiff seeks compensation from Defendants under two theories. First, Plaintiff seeks repayment costs and damages under § 1002(a) of the OPA, which provides that "each responsible party . . . is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2712. In the case of a privately-owned onshore facility that is not a pipeline, the OPA defines "responsible party" as "any person owning or operating the facility." 33 U.S.C. 2701(32)(B). The OPA defines "removal costs" as "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident." *Id.* at § 2701(31).

Second, Plaintiff seeks repayment pursuant to its subrogation rights under §§ 1012 and 1015 of the OPA. *Id.* at §§ 2712(f) and 2715; R. Doc. 1 at 1. After the NPFC has paid a claim, § 1012(f) of the OPA states the federal government "acquir[es] by subrogation all rights of the claimant . . . to recover from the responsible party." 33 U.S.C. § 2712(f). Moreover, § 1015(c) of the OPA entitles the subrogee to bring an action seeking "any compensation paid by the Fund to any claimant pursuant to this Act, and all costs incurred by the Fund by reason of the claim, including interest (including prejudgment interest), administrative and adjudicative costs, and

attorney's fees." *Id.* at 2715(c). Accordingly, as Oil Mop's subrogee, Plaintiff seeks a judgment against Defendants for removal costs of $632,262.49, as well as all additional costs incurred by the Fund, including interest, administrative and adjudicative costs, attorney's fees, and any other appropriate relief. R. Doc. 1 at ¶ 2.

Defendants deny all liability, object to Plaintiff's designation of Defendants as responsible parties under the OPA, and object to Plaintiff's lawsuit in general, alleging that Plaintiff failed to comply with the OPA's notice requirement. R. Doc. 8. Defendants contend the Coast Guard failed to properly investigate other potential sources of the oil and did not properly identify the source or pathway from Defendants' facility to the oil spill. *Id.* at 12. Defendants maintain that "[t]he oil discharge and cleanup costs that are the subject of the Plaintiff's Complaint were caused solely by negligence, acts, fault, or omissions of one or more third parties for whom the Defendants are not legally responsible." *Id.* at 10.

A bench trial began on October 5, 2020 and concluded on October 8, 2020. The Court issues its Findings of Fact and Conclusions of Law on December 17, 2020, concluding that Defendants were liable to Plaintiff for $631,228.74 of removal costs paid from the Fund. R. Doc. 147 at 18. The Court also found that Defendants were liable for $1,033.75 in administrative costs incurred by the NPFC to adjudicate Oil Mop's claim; for interest, including prejudgment interest; and for all litigation costs and attorney's fees. *Id.* at 18-19.

However, Defendants appealed, and on May 26, 2022, the United States Court of Appeals for the Fifth Circuit reversed this Court's decision in part, vacated it in part, and remanded the case for a new trial. The Fifth Circuit only addressed Defendants' argument that they had a right to a jury trial, holding that Defendants did have a right to a jury trial under the Seventh Amendment because this case constitutes a "suit at common law." Accordingly, the Fifth Circuit remanded the

case to this Court for a jury trial.

## II. PRESENT MOTION

In anticipation of the retrial of this matter before a jury, Defendants have filed the instant motion asking the Court to partially exclude Plaintiff's expert testimony from an engineer, Mr. Gary Amendola, which the Court previously held to be admissible during the bench trial. R. Doc. 227. Amendola was asked to provide answers and opinions to five interrogatories:

> 1. Did ERR's management, treatment and discharge of industrial wastewater for the period March 2015 to May 2015 comport with the terms and conditions of LPDES Permit No. LA0125750?
> 2. On May 12-13 did ERR retain all of the oil and oily wastewater that was transferred from Envision Marine Services barge No. DBL118 to the ERR facility?
> 3. As of May 2015, was the ERR facility configured such that oil, partially treated wastewater or untreated wastewater could be discharged to the Mississippi River?
> 4. Was the oil observed in the Mississippi River adjacent to the ERR facility on May 13, 2015 found in the vicinity of the terminal end of the ERR LPDES Permit Outfall 001 discharge pipe?
> 5. Other regulatory issues associated with ERR operations.

R. Doc. 227-2 at 2–3.

Defendants challenge the admissibility of Amendola's answers to Questions 1 and 5, arguing that these are irrelevant and have nothing to do with the alleged illegal discharge in May 2015 for which Defendants are now charged. R. Doc. 227 at 3–4. On the other hand, the United States argues that Amendola's answers to Questions 1 and 5 are evidence of Defendants' routine practice of making illegal discharges, admissible under Federal Rule of Evidence 406 to show that Defendants acted in accordace with this routine practice by making the alleged discharge in May 2015. R. Doc. 228 at 5–8.

## III. APPLICABLE LAW

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This rule codifies the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

The Court must act as a "gate-keeper" to ensure the proffered expert testimony is "both reliable and relevant." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). "The primary purpose of the *Daubert* filter is to protect juries from being bamboozled by technical evidence of dubious merit." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003); *see also Whitehouse Hotel Ltd. Partnership v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010).

The threshold question in determining whether an individual may offer expert testimony under Rule 702 is whether the individual is qualified to do so. Fed. R. Evid. 702.

Apart from determining the qualifications of the expert, the Court's gate-keeping role also generally includes ensuring the proffered expert testimony is "both reliable and relevant." *Wells*, 601 F.3d at 378. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (quoting *Daubert*, 509 U.S. at 592–93). With respect to reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. To assess methodology, the Court looks to five factors: (1) "whether the theory or technique in question can be (and has been) tested," (2)

"whether it has been subjected to peer review and publication," (3) "its known or potential error rate," (4) "the existence and maintenance of standards controlling its operation," and (5) "whether it has attracted widespread acceptance within a relevant scientific community." *Id.* at 579. Moreover, *Kumho Tire* expanded *Daubert* to all experts and, in doing so, emphasized the flexibility of the Court's assessment under *Daubert*. Specifically, the Court has the leeway to decide how to assess experts based on their expertise, "whether basing testimony upon professional studies or personal experience." *Kumho Tire*, 526 U.S. at 152.

When the admissibility of expert testimony is challenged under *Daubert*, the proponent of the evidence bears the burden of proving that the testimony is reliable and relevant. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. *Id.* Rather, some objective, independent validation of the expert's methodology is required. *Id.* In this regard, however, it is not necessary for the proponent of the evidence to prove that "the testimony is factually correct." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). The *Daubert* analysis is not intended to judge the accuracy of the expert's conclusions. See *Guy v. Crown Equip. Corp.*, 394 F. 3d 320, 325 (5th Cir. 2004).

Ultimately, a court's role as a gatekeeper does not replace the adversary system. *Daubert*, 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for [the fact finder's] consideration." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.

1987)).

## IV. DISCUSSION

Defendant does not challenge the reliability of Amendola's expert testimony, rather asserting that his answers to Questions 1 and 5 are irrelevant, and thus inadmissible under *Daubert*. Defendant also points to Rule 404(a)(1) of the Federal Rules of Evidence, which provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." The United States responds that Amendola's answers to Questions 1 and 5 are relevant and are not inadmissible character evidence, but rather are admissible under Federal Rule of Evidence 406 as evidence of Defendants' habit or routine practice of using their underwater discharge pipe to make unpermitted discharges into the Mississippi River.

As to Question 1,[1] Amendola states in his report that, based on his review and assessments of manifests of incoming wastewaters to the facility in the months before the discharge at issue in this case, there were some 344,000 gallons or more of wastewater could not be accounted for, and which thus appear to have been discharged by Defendants into the river in bypass of the monitoring and reporting which was required. Similarly in Question 5[2], Amendola states that he has found violations of other provisions of Defendants' permit which might be at issue with respect to the alleged instant discharge, including unauthorized batch discharges into the river without required sampling and analysis, lack of reporting the date and volume or each batch discharge, and lack of record keeping.

Rule 404(a)(1) of the Federal Rules of Evidence provides that "[e]vidence of a person's

---

[1] Did ERR's management, treatment and discharge of industrial wastewater for the period March 2015 to May 2015 comport with the terms and conditions of LPDES Permit No. LA0125750?

[2] Other regulatory issues associated with ERR operations.

character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Rule 404(b)(1) further provides that "[e]vidence of a crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, Rule 406 allows the admission of "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."

The United States asserts that Amendola's answers to Questions 1 and 5 are admissible as evidence of ERR's routine practice of making unauthorized discharges of wastewater into the Mississippi River. But there is a high threshold for the admission of this kind of habit evidence due to the strong potential for prejudice. *See, e.g.*, *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 511 (4th Cir. 1977). This kind of evidence can easily afford a basis for the improper inference, prohibited by Rule 404(b)(1), that because a party may have behaved badly in the past, that party must have committed the act charged.

"To offer evidence of a habit, a party must at least demonstrate a regular practice of meeting a particular kind of situation with a specific type of conduct." *Rivera v. Robinson*, 2021 WL 2635465, at *5 (E.D. La. June 24, 2021). To qualify as a habit or routine practice under Rule 406, the action alleged must be "a regular response to a repeated specific situation that has become semi-automatic." *Id.* In other words, habit evidence is admissible under Rule 406 if the proponent can demonstrate that a given circumstance is always met with a specific response.

Here, Amendola offers expert analysis tending to show that ERR was taking in more wastewater than it could hold without proper records showing that that wastewater was discharged in conformity with ERR's permit. Therefrom, Amendola infers that ERR must have had a regular

practice of discharging wastewater in violation of its permit.

This inference is arguably tenuous, as there are potentially other explanations for what ERR did with that wastewater other than discharging it into the river. For example, ERR may have trucked that water away to another site. But even assuming that ERR did have a routine practice of violating its permit by discharging wastewater without the required testing and record keeping, this does not constitute evidence that ERR had a routine practice of illegally discharging oily wastewater.

ERR is not charged in this matter with violating its permit; it is charged with an illegal midnight discharge of oily wastewater. And, as Plaintiff has previously stipulated in this case, there is no evidence that before the alleged incident there was any oil spill or sheen connected to ERR's facility. *See* R. Doc. 121. ERR may have been violating its permit, but there is no evidence that these alleged permit violations included illegally discharging oily wastewater. There is therefore no evidence that ERR's "semi-automatic" and "regular response" to any "repeated specific situation" was to discharge oily wastewater into the river. *Rivera*, 2021 WL 2635465, at *5; *see also Grand Isle Shipyards, Inc. v. Black Elk Energy Offshore Operations, LLC*, 519 F.Supp.3d 322, 327 (E.D. La. 2021) (rejecting evidence of previous permit violations as habit evidence to show that defendant failed to comply with safety regulations on a particular incident).

Accordingly, the challenged testimony is not admissible as habit evidence under Rule 406, but instead constitutes impermissible and prejudicial character evidence intended to show that ERR's alleged previous violations of its permit imply that it illegally discharged oily wastewater during the incident in question. In the new context of a jury trial, the Court must exclude this evidence.

V.    **CONCLUSION**

For the foregoing reasons, Defendants' motion is hereby **GRANTED**.

New Orleans, Louisiana, this 17th day of February, 2023.

*/s/ Eldon E. Fallon*
ELDON E. FALLON
U.S. DISTRICT COURT JUDGE